UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Case No. 2:19-cr-00131 |
| KORY LEE GEORGE, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND REQUEST FOR A *FRANKS* HEARING
(Doc. 29)

Pending before the court is Defendant Kory Lee George's motion to suppress tetrahydrocannabinol ("THC") products and pills seized on September 9, 2019 from his motorcycle's saddlebags and storage containers pursuant to a search warrant. (Doc. 29.) Defendant argues the search warrant affidavit dated September 6, 2019 (the "Search Warrant Affidavit") contained false statements and material omissions, rendering the search without probable cause in violation of the Fourth Amendment to the United States Constitution. In the alternative, Defendant requests an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to establish the intentional falsehoods. The government filed an opposition on April 8, 2020, arguing that a *Franks* hearing is not necessary because the undisputed contents of the Search Warrant Affidavit establish probable cause and because Defendant has failed to show that the allegedly false statements were intentionally or recklessly made.[1]

Defendant appears to acknowledge that certain aspects of his motion are premature:

> [Defendant] seeks to preclude being prosecuted on charges arising from the materials seized from the motorcycle. He also seeks to preclude drugs or drug materials [from] being part of a 'relevant conduct' calculus in a

---

[1] Although the parties debate whether Defendant's motion to suppress was timely filed, the court granted two unopposed motions to extend the deadline for filing pretrial motions in the course of briefing. *See* Docs. 33 and 35.

> possible Sentencing Guidelines calculation in a presentence report. Toward these ends, he seeks an order that the alleged THC and other drugs and/or drug related items may not be used by the government in a trial and that they may not be used in a sentencing proceeding. He acknowledges that an order of suppression would not necessarily prevent drug materials seized from being part of a relevant conduct assessment at a possible future sentencing. He also acknowledges that the Court might see the instant motion as more properly raised *in limine*. He moves with this motion now, though, in order to not waive the right to raise this issue.

(Doc. 29 at 2.) The government agrees and argues that Defendant cannot procedurally preclude a hypothetical future prosecution.

The government is represented by Assistant United States Attorneys William B. Darrow and Spencer Willig. Defendant is represented by Federal Public Defender Michael L. Desautels.

## I. Findings of Fact.

The following facts are derived from a September 4, 2019 affidavit supporting the criminal complaint filed in this case (the "Criminal Complaint Affidavit") as well as from the Search Warrant Affidavit, which incorporates the Criminal Complaint Affidavit by reference.

On July 11, 2019 at approximately 9:45 p.m., Defendant's stepfather, David Auclair, was shot to death at the LaPlatte Headwaters Town Forest parking lot in Hinesburg, Vermont. Nine 9mm caliber bullets were recovered from Mr. Auclair's body. On July 14, 2019, Vermont State Police ("VSP") retrieved a Beretta Model 92FS 9mm caliber pistol, bearing serial number BER453210 (the "Beretta"), from Lewis Creek near Tyler Bridge Road in Monkton, Vermont, close to the home of Mr. Auclair and his wife, Angela Auclair, who is Defendant's mother. The Vermont Forensic Laboratory later determined that the bullets recovered from Mr. Auclair's body were fired by the Beretta.

On the evening of July 10, 2019, the Beretta, along with two other firearms including a .380 caliber pistol and a second 9mm Beretta as well as their loaded magazines, were stolen from a locked living room cabinet in James Synnott's home at 179 Arbor Lane in Colchester, Vermont. Mr. Synnott reported to law enforcement that

the pistols and loaded magazines were stolen between July 4, 2019, when his son had last checked the cabinet, and July 19, 2019, when Mr. Synnott reported the theft to the police. Investigation revealed that Mr. Synnott's ex-wife purchased the Beretta in August of 2016 and that Mr. Synnott purchased another 9mm caliber Beretta Model 92A1 bearing serial number K629272 in February of 2013.

At the time of the alleged homicide, Angela Auclair lived with her husband, David Auclair, but was also in a romantic relationship with John Turner. Defendant resided at certain times in a trailer on the Auclairs' property.

As part of its investigation into Mr. Auclair's death, VSP reviewed Mr. Turner's cell phone location data, as well as text messages obtained from Defendant's and Mr. Turner's cell phones and from Mr. Auclair's phone records. Defendant consented to the cell phone search. Location data from Mr. Turner's cell phone, allegedly corroborated by other forensic evidence, established that on July 10, 2019, Defendant and Mr. Turner drove to the area of Mr. Synnott's residence while Mr. Synnott was at dinner with Mr. and Ms. Auclair. Mr. Turner allegedly dropped off Defendant near Mr. Synnott's residence shortly before Mr. Synnott's ADT security system registered an entrance to his home. Mr. Turner then allegedly picked up Defendant after the ADT security system registered an individual leaving the Synnott residence.

Mr. Synnott advised law enforcement that Mr. Auclair arranged to have dinner with him and Ms. Auclair at the Light House Restaurant in Colchester, Vermont that evening. At approximately 2:00 p.m. on July 10, 2019, Ms. Auclair asked Mr. Auclair if he "ever call[ed] Jamie [Synnott] about dinner at [L]ight [H]ouse." (Doc. 29-2 at 15, ¶ 14.) Ms. Auclair texted Defendant at approximately 4:45 p.m. to "[c]ome to [the] mall [']cause you['re] gonna have to leave from here." *Id.* at 16, ¶ 15. At approximately 5:07 p.m., Defendant confirmed he was in the food court of the mall where they were meeting. Mr. Turner's cell phone location data indicated that he was in the vicinity of University Mall in South Burlington, Vermont at approximately 5:09 p.m.

Ms. Auclair texted Mr. Auclair at approximately 5:24 p.m. that she was heading to the Light House. Two minutes later, Mr. Turner's cell phone location data revealed he

3

was traveling north from University Mall. At approximately 5:36 p.m., surveillance video from a business on Roosevelt Highway recorded a maroon Chevrolet Suburban traveling north. Law enforcement recognized the vehicle as one registered to Mr. Turner. Mr. Turner's cell phone location data indicated that he stopped in the vicinity of a Colchester restaurant called the Spanked Puppy, which is 1.3 miles from Mr. Synnott's house, for approximately seventeen minutes between 5:40 p.m. and 6:00 p.m. At 5:48 p.m., Ms. Auclair texted Defendant: "No one here yet not till 6." *Id.* at 16, ¶ 17. At approximately 5:57 p.m., Mr. Turner's cell phone location data revealed that he traveled from the area near the Spanked Puppy towards Route 2A and to Depot Road, which runs perpendicular to Arbor Lane. Arbor Lane has approximately ten houses, one of which belongs to Mr. Synnott, and terminates in a cul-de-sac.

According to Mr. Synnott's ADT security system data, the door between his house and garage opened and closed at approximately 5:40 p.m., after which a neighbor's surveillance camera recorded Mr. Synnott's Honda SUV leaving his driveway. At approximately 6:04 p.m., surveillance footage from the same camera recorded a red sedan traveling south towards Arbor Lane's cul-de-sac past Mr. Synnott's home. Approximately one minute later, the red sedan drove north towards Depot Road. Further investigation revealed that a red Toyota Corolla sedan is registered to Mr. Turner. Defendant subsequently told VSP Detective Trooper Patrick Slaney that he regularly drove the red Toyota Corolla. At approximately 6:07 p.m., the neighbor's surveillance camera captured a man whose physical build is similar to Defendant's carrying a black bag walking north on Arbor Lane and up Mr. Synnott's driveway. The ADT security system recorded the door between Mr. Synnott's garage and home opening at approximately 6:07 p.m. and closing at approximately 6:18 p.m. The door did not open again until 8:14 p.m. when Mr. Synnott returned home from dinner.

Mr. Turner's cell phone location data showed he traveled in the area around Depot Road between 6:09 p.m. and 6:22 p.m., at which point he returned to Arbor Lane. According to Defendant's cell phone data, Defendant placed several calls to Mr. Turner during this time period. The neighbor's surveillance camera recorded a red sedan driving

south on Arbor Lane towards the dead end at approximately 6:22 p.m. and driving north towards Depot Road one minute later. At approximately 6:38 p.m., video surveillance footage from a business on Roosevelt Highway showed a red sedan and red SUV consistent with the red Toyota Corolla and Mr. Turner's Chevrolet Suburban both traveling southbound from Colchester.

When law enforcement later interviewed Mr. Turner, he recalled dropping off Defendant in the area of Depot Road on an unspecified date. According to Mr. Turner, "we went down there to meet a kid, I dropped him off, I come back through and I met him." *Id.* at 18, ¶ 25. He admitted to driving the red Toyota Corolla and leaving Defendant "in that cul[-]de[-]sac or something." *Id.* Mr. Turner believed Defendant was visiting the area to sell THC cartridges. *Id.* Mr. Turner advised law enforcement that Defendant was out of the car for "maybe [ten] minutes" and was carrying a black bag with him when he returned to the vehicle. (Doc. 29-2 at 18, ¶ 25.) Mr. Turner further reported Defendant's girlfriend, Kirstin Stillwell, accompanied Mr. Turner and Defendant and remained in the vehicle.

On July 10, 2019 at approximately 10:30 p.m., the Auclairs' neighbors heard several shots fired. On July 16, 2019, VSP recovered three 9mm casings and one 9mm cartridge from a parcel of land next to the Auclairs' house. During an August 2, 2019 search of this parcel of land, VSP recovered a bag with elastic bands at the bottom and a hole that appeared to have been shot through one end which may have been used as a cartridge-capture device. Upon testing, the Vermont Forensic Lab concluded that the Beretta fired the recovered 9mm casings, which was deemed notable because no casings were found at the scene of Mr. Auclair's death.

On July 15, 2019, law enforcement returned to the Lewis Creek area where they recovered the Beretta and, using a metal detector, recovered a TCL TracFone several feet away. Law enforcement determined the cell phone had been purchased on July 11, 2019, the day of Mr. Auclair's death, and had made only two phone calls: one to a Rite Aid in Milton, Vermont and one to Mr. Auclair at approximately 9:15 p.m., thirty minutes before his death. Further investigation revealed that the Rite Aid sold only one TracFone

5

on July 11, 2019, that the purchaser paid cash for the phone, and that he or she used a Rite Aid frequent shopper ID account associated with Meaghan Parrot. Defendant later admitted to law enforcement that he was at Ms. Parrot's residence on the evening of July 11, 2019 and had gone to the Rite Aid in Milton in the red Toyota Corolla that day, although he could not remember what he had purchased.

VSP members obtained a search warrant for Defendant's mobile home located in the driveway of 116 Cattail Lane in Monkton, Vermont, where he resides with Ms. Stillwell. On August 2, 2019, pursuant to the search warrant, law enforcement recovered a Savage Arms Stevens Model 320 12-gauge shotgun, bearing serial number 131355F (the "Shotgun"), found above a sliding glass door in the living room. Further investigation revealed that the Shotgun was purchased at Dick's Sporting Goods in Williston, Vermont on July 11, 2013 by Joshua N. Dusharm, who then sold it to Kirk Delibac. In the spring of 2019, the Shotgun as well as other firearms and ammunition were stolen in a burglary of a hunting camp belonging to Mr. Delibac's father. The Delibacs reported that Defendant visited the hunting camp prior to the burglary.

VSP investigators interviewed Defendant on July 12, 2019 and July 17, 2019. Defendant admitted that he used and sold products containing THC, including the sale of vape cartridges containing THC oil.

On September 4, 2019, Magistrate Judge John M. Conroy found probable cause for the Criminal Complaint which charged Defendant with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), based on his alleged possession of the Beretta and the Shotgun. On September 4, 2019, VSP investigators arrested Defendant. At the time of his arrest, Defendant "had [a Harley Davidson motorcycle] with him[,]" which he claimed that he owned. *Id.* at 7, ¶ 7. While he was being taken into custody, Defendant asked VSP troopers to obtain his sneakers and wallet from the motorcycle's right saddlebag. He "did not otherwise consent to allow members of law enforcement to search or access the [motorcycle]." *Id.* VSP Detective Sergeant James Vooris checked the motorcycle's Vehicle Identification Number against State of Vermont registration records and determined that until August of 2019 the motorcycle was registered to David Auclair

6

and on September 4, 2019, it was registered to Defendant and Ms. Auclair.

The motorcycle was towed to VSP's barracks in Williston, Vermont. On September 5, 2019, VSP Trooper Crista Maurice deployed a drug detection dog named "Cole" to sniff the motorcycle in the barracks' garage. Prior to this canine sniff, the Vermont Criminal Justice Training Council Canine Certification Committee tested Cole's reliability in a controlled setting to determine whether Cole could reliably detect the odor of marijuana, hashish, cocaine, crack, Ecstasy, heroin, and methamphetamine. Cole passed this certification. The Committee first certified Cole on February 13, 2013, and had most recently recertified him on December 12, 2018. Cole performed an off-lead free search in the barracks' garage where the motorcycle was stored and alerted to the presence of drugs in the motorcycle by snapping his head toward the motorcycle, inhaling, and sitting down.

On September 6, 2019, law enforcement applied for a warrant to search the motorcycle as part of an investigation concerning Defendant's "alleged recent possession of stolen firearms including [the Beretta] and [the Shotgun]." *Id.* at 6, ¶ 5. The Search Warrant Affidavit avers that the Beretta and two additional firearms, including a Llama .380 pistol and second Beretta 9mm pistol, were stolen from a Colchester residence on or about July 10, 2019, and although the Beretta was recovered on July 14, 2019, the other two pistols remain missing. The Search Warrant Affidavit states the Shotgun "was stolen together with other firearms and ammunition from a camp in upstate New York." *Id.*

ATF Special Agent Benjamin I. Cohen, the affiant for the Search Warrant Affidavit, attests he was informed that, in the course of VSP's investigation, witnesses indicated Defendant "was involved in the illicit sale of THC products in and around Chittenden County." *Id.* at 6, ¶ 6. Special Agent Cohen also learned Defendant admitted in the two July of 2019 law enforcement interviews that he used and sold THC products. The Search Warrant Affidavit describes both the circumstances surrounding Defendant's arrest and the canine sniff.

Based on the information contained in the Criminal Complaint Affidavit and the Search Warrant Affidavit, Special Agent Cohen asserted that probable cause existed to

7

search the motorcycle for a violation of 21 U.S.C. § 841(a) (knowingly or intentionally distributing or possessing with intent to distribute THC) "given [Defendant's] admissions to law enforcement and the K9 alert on the [motorcycle][,]" (Doc. 29-2 at 8, ¶ 10), and for a violation of 18 U.S.C. § 922(g)(1) "given the missing firearms referenced above and in the [Criminal] Complaint Affidavit, [Defendant's] criminal history—which renders him ineligible to possess firearms under federal law—and the size of the [motorcycle's] saddle bags and storage compartments, which are large enough to accommodate the missing pistols and ammunition[.]" *Id.*

On September 5, 2019, prior to the filing of the search warrant application, Defendant was indicted by a grand jury on two counts of knowingly being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) arising out of his alleged knowing possession of the Beretta and the Shotgun. On September 6, 2019, Magistrate Judge Conroy issued the search warrant, and a search of the motorcycle's saddlebags was executed on September 9, 2019.

Defendant identifies three false statements or omissions in the Search Warrant Affidavit. First, at the time of his arrest on September 4, 2019, Defendant contends law enforcement told him they were seizing the motorcycle and all items contained therein. Defendant asserts law enforcement used his request for his sneakers and wallet to search not only for those items but to search the motorcycle's compartments in a manner that exceeded the scope of his consent. He argues that the Search Warrant Affidavit omits the existence and extent of this warrantless search as well as its lack of results.

Defendant points out the Search Warrant Affidavit erroneously states that the motorcycle was registered to Defendant and his mother, whereas he claims that records from the Vermont Department of Motor Vehicles indicate the motorcycle was registered only to him as of September 4, 2019.

And finally, Defendant argues that both the Search Warrant Affidavit and the Criminal Complaint Affidavit falsely insinuate (based on ADT security data and video surveillance footage) that Defendant stole weapons from Mr. Synnott's home without "any acknowledgment that the supposed description of the figure near the Synnott

8

residence could have applied to likely thousands of people then in Vermont." (Doc. 29 at 5.)

## II. Conclusions of Law and Analysis.

### A. Whether Defendant's Motion is Ripe.

Defendant requests that the court preclude his future prosecution arising from the seized THC products and pills as well as use of that evidence in a trial or sentencing proceeding, including as part of the "'relevant conduct' calculus in a possible Sentencing Guidelines calculation in a presentence report." *Id.* at 2. The government argues Defendant's motion is not ripe because he has not been charged with any offense concerning his possession of the seized evidence.

Courts routinely deny motions to suppress evidence as premature when the defendant has not been charged with a crime in connection with the seized materials. *See, e.g., Doane v. United States,* 2009 WL 1619642, at *9 (S.D.N.Y. June 5, 2009) (denying motion to suppress as not ripe for adjudication where "[n]o criminal charges have been brought against [defendant] and therefore, it appears premature to address the issue of suppression without knowing how the Government intends to use these documents"); *United States v. Plummer,* 2006 WL 2226010, at *6 (W.D. Pa. Aug. 2, 2006) (denying motion to suppress pistols and drugs seized because "no crimes have been charged in connection with these items"). Defendant has been neither charged nor indicted with an offense arising from the seized THC products and pills, and a motion to suppress this evidence in a hypothetical future prosecution is therefore "premature and may be considered if and when proceedings arise in which the Government seeks to use the ... information obtained[.]" *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 359 (1977).

Similarly, it would be premature to rule whether the seized THC products and pills constitute "relevant conduct" for sentencing purposes where, as here, Defendant "has not pled guilty to or been found guilty of the charges pending against him, and therefore continues to be presumed innocent of those charges." *United States v. Stern,* 313 F. Supp. 2d 155, 173 (S.D.N.Y. 2003) (holding defendant's motion to compel the government to move for a sentencing departure was "premature" because the court's ruling would be

9

"rendered entirely hypothetical" if defendant were acquitted or if the government capitulated post-conviction); *see also United States v. Vale*, 566 F. App'x 56, 57 (2d Cir. 2014) (holding defendant's motion to declare that his conviction for criminal contempt did not constitute "a felony conviction for the purpose of being allowed to vote or possess a weapon" was not ripe for adjudication because the "hypothetical" denial of voting or gun ownership privileges "'depend[ed] upon contingent future events that may not occur as anticipated, or indeed may not occur at all'") (alteration in original) (quoting *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013)).

For the reasons stated above, the court DENIES as premature Defendant's request for an order precluding future prosecution on charges arising from the THC products and pills seized on September 9, 2019 and precluding the use of these seized materials in a future trial or sentencing proceeding.

### B. Whether Defendant Is Entitled to a *Franks* Hearing.

Even if Defendant's motion to suppress were ripe, a *Franks* hearing would not be warranted. Because a search warrant affidavit enjoys "a presumption of validity[,]" *Franks*, 438 U.S. at 171, a defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and must further establish that "the allegedly false statement is necessary to the finding of probable cause[.]" *Id.* at 155-56. The defendant's burden of proof in this respect is by "a preponderance of the evidence[.]" *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008), *cert. denied*, 555 U.S. 1061 (2008). The Second Circuit has nonetheless observed that "[t]he *Franks* standard is a high one[.]" *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

To demonstrate that the misrepresentations were intentional:

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses

10

> should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks*, 438 U.S. at 171.

To assess materiality, the court engages in "a process of subtraction" whereby it "disregard[s] the allegedly false statements and determine[s] whether the remaining portions of the affidavit would support probable cause to issue the warrant." *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003), *cert. denied*, 543 U.S. 1056 (2005) (citation omitted). For omissions, courts "insert the omitted truths[.]" *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (citation omitted). "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)). If the remaining portions of the search warrant give rise to probable cause, "the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Id.* Indeed, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no [*Franks*] hearing is required." *Franks*, 438 U.S. at 171-72 (footnote omitted).

Probable cause exists to search when, considering the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246-47 (2013); *see also United States v. Tuton*, 893 F.3d 562, 570 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 1192 (2019) ("Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present.") (citation and internal quotation marks omitted).

11

At best, Defendant points to minor inconsistencies in an otherwise extensive and accurate factual recitation under oath that amply establishes probable cause to search the motorcycle for evidence of THC. The alleged misstatements and omissions are thus "not enough to constitute the '*substantial* preliminary showing' of falsity necessary to justify a *Franks* hearing." *United States v. Morris*, 509 F. App'x 58, 61 (2d Cir. 2013) (emphasis in original); *see also United States v. Lucas*, 379 F. Supp. 3d 182, 197 (W.D.N.Y. 2019) (denying *Franks* hearing because alleged omission did not outweigh "the probable cause that results from an alert by an appropriately trained, reliable dog" and "there was additional information before [the authorizing judge] to support his ultimate probable cause determination").

If the Search Warrant Affidavit were corrected in the manner Defendant suggests, the probable cause analysis would remain unchanged because Defendant admitted to investigators that he used and sold THC products, and a certified canine alerted to the presence of drugs in the vicinity of a motorcycle Defendant had in his possession when he was arrested and which was registered in his name. There was thus "a substantial basis for concluding that probable cause existed" to search the motorcycle's saddlebags and storage containers for THC products. *Gates*, 462 U.S. at 238-39 (alterations, citation, and internal quotation marks omitted); *see also Harris*, 568 U.S. at 248 (holding the record "amply supported the trial court's determination that [canine's] alert gave [officer] probable cause to search [defendant's] truck" where the state "introduced substantial evidence of [canine's] training and his proficiency in finding drugs" and defendant "declined to challenge in the trial court any aspect of [canine's] training"). Defendant has therefore failed to make a substantial preliminary showing that would necessitate a *Franks* hearing.

Because Defendant has failed to establish his entitlement to a *Franks* hearing or suppression, the court DENIES Defendant's motion to suppress all physical evidence seized from the September 9, 2019 search of his motorcycle without prejudice.

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion to suppress and

request for a *Franks* hearing. (Doc. 29.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 18th day of May, 2020.

Christina Reiss, District Judge
United States District Court